**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

.................................................................X

RICHARD YOEST

               Plaintiff,

      - against -

REFRESCO BEVERAGES U.S. INC., JORDAN COOPER
and LISA YAGGIE, in their individual and
professional capacities,

               Defendants.

.................................................................X

Case No.:

**COMPLAINT**

**PLAINTIFF DEMANDS A
TRIAL BY JURY**

     Plaintiff Richard Yoest, by and through his attorneys, Filippatos PLLC, hereby complains

of Defendants Refresco Beverages U.S. Inc. ("Refresco" or the "Company"), Jordan Cooper and

Lisa Yaggie (together, "Defendants"), upon personal knowledge, as well as information and belief,

by alleging and averring as follows:

**PRELIMINARY STATEMENT**

     1.     Plaintiff Richard Yoest's experience at Refresco Beverages — the world's largest

independent producer and bottler for beverage companies like Coca-Cola, Pepsi, Arizona Iced

Tea, and Tropicana — is, sadly, emblematic of the challenges faced by both elderly workers and

those who bear the difficult burden of caring for a sick or disabled family member. Despite being

a highly skilled and seasoned professional with over 20 years of experience in the facilities and

equipment maintenance industry, Plaintiff was devastatingly cast aside by Defendants when his

wife was diagnosed with breast cancer, and he notified the Company of his need for intermittent

leave to care for her.  At a time when Mr. Yoest needed compassion and grace, Refresco chose to

break the law and violate his right to work in an environment free of unlawful discrimination,

harassment, and retaliation.

2.    In fact, immediately upon returning from a protected leave under the Family Medical Leave Act ("FMLA"), Plaintiff was suddenly issued a baseless negative performance evaluation in April 2020 and thereafter put on an unfounded Performance Improvement Plan.  The crux of Plaintiff's purported "poor performance" was his supposed lack of floor presence and alleged need to improve communication – criticism that directly related to his need to care for his disabled wife.

3.    Not only that, but Refresco's managers provided scarce meaningful remedial feedback to Plaintiff about the requirements and areas of improvement set forth in the PIP.  Instead, after yet another period of intermittent leave in February 2021, Refresco abruptly and unilaterally issued a notice to all employees in its Dunkirk facility that the employees' leave use was "***not sustainable to our business.***"

4.    In yet another blow to Plaintiff's career, Defendants Yaggie and Cooper, the Manager and Human Resources Manager respectively,  then marginalized and demoted Plaintiff by unilaterally taking away certain job duties and responsibilities the very same month (June 2021) that he told the Company that he planned to enroll both himself and his disabled wife in Refresco's company-sponsored health insurance plan. Plaintiff's position of Maintenance Manager was also reassigned to a younger employee named Theodore Smith.

5.    Shockingly, in a blatant act of unlawful retaliation for engaging in protected activity, after Plaintiff request further intermittent FMLA leave to care for his wife in August 2021, Defendants unlawfully and abruptly terminated his employment *just two weeks later*.

6.    As a result, Plaintiff brings this action seeking injunctive, declaratory and monetary relief against Defendants for violating his rights under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, as amended by the ADA Amendments Act of 2008, Pub.

L. No. 110-325 ("ADAA"); the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, as amended by the Families First Coronavirus Response Act of 2020, Pub. L.  No. §§ 116-127 (FFCRA"); the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 et seq.; and the New York State Human Rights Law, New York State Executive Law, §§ 296 *et seq.* ("NYSHRL").

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's civil rights under the ADA, FMLA, and ADEA. Moreover, this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332.

8.      This Court has supplemental jurisdiction over Plaintiff's related claims arising under New York law pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 as Refresco is a domestic business corporation doing business in the State of New York and a substantial part of the events or omissions giving rise to this action, including the unlawful discrimination and retaliation alleged herein, occurred in this district.

## ADMINISTRATIVE REQUIREMENTS

10.      On June 21, 2021, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of the ADEA and the ADA arising out of the facts described herein.  On July 27, 2023, the EEOC issued Mr. Yoest a Notice of Right to Sue.  Plaintiff has asserted his ADEA and ADA claims herein within 90 days of receipt of his Notice of Right to Sue.

11.      Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

12.     Plaintiff is 65-year-old adult male and a resident of the State of Pennsylvania and County of Erie.  Plaintiff was a Maintenance Manager at Refresco's Dunkirk, NY facility and worked at the Company from October 1, 2014, until his unlawful firing on August 26, 2021.  At all relevant times, Mr. Yoest met the definition of "employee" and/or "eligible employee" under all applicable statutes.

13.     At all times relevant hereto, Defendant Refresco Beverages U.S. was and is a domestic for-profit corporation duly existing pursuant to, and by virtue of, the laws of the State of Florida and maintains its principal place of business at 8112 Woodland Center Blvd, Tampa, Florida 33614.  Upon information and belief, Refresco employs over 4,000 individuals on a full-time or full-time equivalent basis in 26 facilities located in the United States.  At all relevant times, Refresco met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

14.     Defendant Jordan Cooper is the Operations Manager at Refresco Beverages.  Mr. Cooper supervised Mr. Yoest from early 2020 until Plaintiff's unlawful firing in August 2021, had the power to hire and fire Mr. Yoest, supervised and controlled Mr. Yoest's work schedules and conditions of employment, determined his rate of pay and method of payment, and maintained employment records.  Defendant Cooper also directly participated in the unlawful actions taken against Mr. Yoest, including the decision to subject him to an unlawful PIP, demote Mr. Yoest, and ultimately fire Mr. Yoest.  At all relevant times, Mr. Cooper met the definition of a "person," "employer" and/or a "covered employer" under all relevant statutes.  Upon information and belief, Defendant Cooper is a resident of the State of New York, County of Chautauqua.

15.     Defendant Lisa Yaggie is the Senior Human Resources Manager at the Refresco Beverages facility in Dunkirk, NY.  Ms. Yaggie had the power to hire and fire Mr. Yoest, controlled Mr. Yoest's work schedules and conditions of employment, determined his rate of pay and method of payment, and maintained employment records.  Defendant Yaggie also directly participated in the unlawful actions taken against Mr. Yoest, including the decision to demote Mr. Yoest, subject him to an unlawful PIP, and ultimately fire Mr. Yoest.  At all relevant times, Ms. Yaggie met the definition of a "person," "employer" and/or a "covered employer" under all relevant statutes.  Upon information and belief, Defendant Yaggie is a resident of the State of New York, County of Chautauqua.

## FACTUAL ALLEGATIONS

### I.     Plaintiff is Hired by Refresco and Enjoys Immediate Success

16.     In October 2014, a company called Cott Beverages ("Cott"), which was later acquired by Refresco Beverages, hired Plaintiff as a Maintenance Manager for its Dunkirk facility. By then, Plaintiff had amassed over 15 years of experience in the field of facilities and equipment maintenance.

17.     Prior to joining Refresco, Plaintiff had been a Supervisor for Maintenance Production, Sanitation, Shipping and Receiving at Coca Cola Enterprises ("Coca Cola").  While at Coca Cola, Mr. Yoest worked alongside the engineering team on upgrades and new equipment installations, and implemented standard operating procedures that improved efficiency from 38% to 80%.

18.     From 1999 to 2004, Plaintiff was the Plant Operations Supervisor at Matrix Essentials & Loreal USA ("Loreal"), where he supervised 120 production, maintenance, and

shipping employees, and created and implemented preventative maintenance procedures for twenty-seven production lines.

19.     From 2004 to 2007, Plaintiff was the Maintenance Manager at two plants operated by Brown-Forman ("Brown"), where he developed the company's first working safety team, a lockout program, and standard operating procedures to increase performance and output. Subsequently, from 2008 to 2012, Plaintiff was the Maintenance Manager for Welch's Northeast ("Welch's"), where he developed training programs to improve employee skill sets and safety awareness, among other tasks.

20.     As Maintenance Manager at Refresco Beverages, Plaintiff was responsible for supervising and implementing various process and utilities improvements, as well as ensuring compliance with various state and federal government regulations and licenses.  Plaintiff also managed several employees.  Plaintiff initially reported to Plant Operations Manager Paul Clark. During their time working together, efficiencies across the Dunkirk plant improved from approximately 37% to 63%.

21.     Due to Plaintiff's exemplary management skills, the methods he pioneered and implemented at the Dunkirk location were later emulated at other Refresco locations.

22.     However, Plaintiff's work environment began to change for the worse in or about early 2020.  Mr. Clark was reassigned (against his wishes) to another location, and a much younger employee named Jordan Cooper became the Operations Manager.  An employee named Randy Bell took over as Plant Manager.

23.     Upon information and belief, Mr. Clark was 62 years old at the time, and Mr. Cooper was in his late 30's.  Upon information and belief, shortly after his reassignment, Mr. Clark was fired by Refresco.

## II.   <u>Plaintiff Is Discriminated Against Because of His Age</u>

24.     In or about early 2020, Plaintiff was frequently ridiculed and subjected to comments from Mr. Cooper and Ms. Yaggie about his purported physical limitations, slowness, and inability to quickly adapt to new technology – all dog whistles for his advanced age.

25.     For example, when Refresco implemented a new performance review website, Plaintiff needed help learning to navigate and populate information into it for his direct reports. When Mr. Yoest asked Mr. Cooper for help, Mr. Cooper aggressively replied: "*[g]ive me your mouse, I'll do it.  You old people need to get with the technology.*"

26.     Later, during a staff meeting about an increase in plantwide accidents, Ms. Yaggie stated that most of the accidents *"were related to old people[,]"* and, ominously, that, *"we will just have to get rid of the old people."* Shockingly, Ms. Yaggie continued her ageist remarks by saying: *"When you hit 60 your body starts to break down.  We have to find ways where people don't have to stay forever.  Is there a payoff only if you complain or fall down the stairs?"* Plaintiff was the oldest person in the room.

27.     Shortly thereafter, Safety Supervisor Loren Chase brought in an outside safety group to individually assess certain employees about their abilities to do physical tasks such as bending, walking, and lifting.  Mr. Yoest was never given the results of this assessment.

28.     Mr. Cooper and Ms. Yaggie called another meeting in 2020 to address harassment of maintenance employees.  After an older maintenance employee left the room, Mr. Cooper loudly stated that: "*old people get really mean and cranky."* This gentleman was later terminated at Mr. Cooper's and Ms. Yaggie's recommendation.

29.     Comments like those mentioned *infra* were made in Mr. Yoest's presence often, but nothing was ever done by Refresco to reprimand Mr. Cooper or Ms. Yaggie.  Indeed, the

Company fostered an environment that discouraged complaints and outcasted employees who raised issues of unlawful treatment.

### III.    Plaintiff Begins Intermittent FMLA-Protected Leave but Continues to Suffer Discrimination and Retaliation, Culminating in His Placement on an Unlawful PIP

30.    In March of 2020, Plaintiff's wife was diagnosed with breast cancer.  Mr. Yoest requested intermittent FMLA leave to accompany his wife to various doctors' appointments, the first of which was on April 6, 2020.   While Mr. Yoest was out on FMLA leave, he still continued to log into the Company's database to attend daily staff meetings and represent the maintenance department, despite being under no obligation to do so.

31.    On April 9, 2020, a mere three days after Plaintiff availed himself of FMLA protected leave, Mr. Yoest received a negative performance evaluation for the first time during his employment at Refresco.   This negative evaluation identified various purported areas of improvement, including Plaintiff's relationship with his team and "communication." Despite the acknowledging countless examples in the evaluation of Plaintiff's positive performance, Mr. Cooper astonishingly issued Plaintiff an overall rating of "Developing Expectations."

32.    During his five years at Refresco, Mr. Yoest ***had never*** received a negative performance review prior to this one.  In fact, in his 2017 performance review, Mr. Clark rated Mr. Yoest as either "Exceeds" or "Meets Expectations" in every category and noted that: "Rick continues to grow with us, he is technically competent and administratively solid.   Rick is respected by his peers for what he provides and his contribution to the team."

33.    Shortly after receiving the unfounded negative performance review, Mr. Yoest utilized intermittent FMLA leave on April 15 and April 23, 2020, to meet with doctors and plan his wife's upcoming cancer surgery.

34.     Less than one week later, on April 28, 2020, Plaintiff was issued a baseless and retaliatory 90-day Performance Improvement Plan ("PIP").

35.     Mr. Yoest was taken aback since he had previously been acknowledged as meeting all expectations in his 2019 performance reviews.  Indeed, prior to the PIP, Mr. Cooper never mentioned that he was unhappy with Mr. Yoest's performance.

36.     During the next month, May 2020, Mr. Yoest worked tirelessly to meet all the requirements and goals laid out in the retaliatory PIP, and scheduled weekly meetings with Mr. Cooper, Ms. Yaggie, and Mr. Bell to review the PIP's expectations.

37.     To his dismay, Ms. Yaggie and Mr. Bell failed to respond to his calendar invitations, while Mr. Cooper provided little to no guidance even though the PIP clearly outlined that *management action* was necessary to support improvement.

38.     For example, on May 6, 2020, Mr. Yoest scheduled a meeting with Mr. Cooper, but Mr. Cooper responded "tentative."  Likewise, on May 8, 2020, Mr. Yoest submitted comments regarding line supervisors' action plans (as was required of him by the PIP) to Mr. Cooper, but he failed to provide any feedback.

39.     Then, on May 12, 2020, Mr. Yoest proposed performance expectations for the Maintenance Supervisors whom he oversaw – a measure required by the PIP and purportedly meant to aid his allegedly deficient "communication." Mr. Cooper reviewed the plan and approved it.  Two days later, on May 14, 2020, Mr. Yoest scheduled a meeting with Mr. Cooper to review his plan for conducting one-on-one meetings with his staff.  Mr. Cooper ultimately approved this plan too.

40.     In or about mid- June 2020, Mr. Cooper told Mr. Yoest that he no longer needed to schedule weekly meetings because he was "doing a good job." Ms. Yaggie echoed this sentiment.

As such, Mr. Yoest had no reason to believe that he had not satisfactorily met the expectations laid out in the PIP.

41.     On June 25, 2020, Plaintiff's wife was scheduled to have a right mastectomy due to her ongoing battle with breast cancer.  Mr. Yoest took intermittent leave to accompany his wife to pre-surgery appointments and care for her in the aftermath of her surgery on the following dates: June 10, 2020, June 23, 2020, and June 25-July 21, 2020.  Mr. Yoest returned to work in late July 2020.

42.     On July 28, 2020, the PIP issued to Plaintiff expired.  Plaintiff was never informed that he failed to meet any expectation set forth in the PIP.  Instead, he received only positive feedback about his performance.

43.     For example, on September 1, 2020, Ms. Yaggie lauded Mr. Yoest because "our machines have been running extremely well and this is in part to the efforts you have made over the last few months to get re-engaged and lead your Maintenance team.  ***Keep up the momentum!***"  Mr. Bell echoed this sentiment, stating "***I 2nd that Lisa.  Rick, great job!***"

44.     As a result, over the course of the next several months, Mr. Yoest remained successfully engaged in various tasks and projects.  Not once was he notified that his performance was "substandard" or that he was failing to meet his expectations as Maintenance Manager.

45.     In the Fall of 2020, Mr. Yoest again requested intermittent FMLA leave from October 6-October 19, 2020, to care for his wife in connection with her reconstructive breast surgery and her declining mental health.

46.     On November 15, 2020, Plaintiff's wife was admitted to a behavioral health crisis residential unit.  Over the course of the next several months, she would be admitted to several other inpatient and outpatient programs to treat her ongoing declining mental health.

47.     Mr. Yoest continued to keep Mr. Cooper and Ms. Yaggie abreast of his need to take time off to care for his wife.  For example, on January 18, 2021, Mr. Yoest used intermittent leave to bring his wife to the University of Pittsburgh Medical Center ("UPMC"), Safe Harbor's Crisis Residential Unit.  On February 1, 2021, and February 16, 2021, Plaintiff again requested leave to bring his wife to appointments to address her declining mental health.

48.     The following day, on February 17, 2021, Ms. Yaggie sent a letter to all hourly employees at the facility regarding "NYS Paid Sick Leave law," warning staff to think twice before trying to avail themselves of the new law, like Mr. Yoest.  Specifically, she wrote: "*[i]n the first 5 weeks of [the NYPSL] being in effect, our employees have used the equivalent of 65 work weeks.  This is not sustainable to our business.  We have too many call offs and cannot adequately staff to meet our production demands.*"

49.     Yet even while Mr. Yoest was out on FMLA protected leave, he continued to work and attend daily staff meetings, despite being under no obligation to do so.  In early 2021, Mr. Yoest received a $16,000 bonus in recognition of his strong performance.

## IV.    The Company Retaliates Against Mr. Yoest After He Requests Company-Sponsored Health Insurance Coverage For Him and His Wife

50.     In or about late April 2021, it became clear that due to her disability and declining mental health, Plaintiff's wife would have to resign from her position with the Veteran's Affairs Hospital and would lose her healthcare coverage through them.

51.     As a result, Plaintiff informed Megan Kristan, Human Resource Generalist, that both he and his wife would need to enroll in Refresco's health insurance plan.

52.     On or about May 14, 2021, Plaintiff provided the necessary documentation to become enrolled in the Company's health insurance plan.

53.     However, Plaintiff was then repeatedly given incorrect information by Human Resources.  This resulted in a lapse of health insurance coverage for himself and his wife of several weeks, which further exacerbated his wife's declining mental health.

54.     Plaintiff received no assistance from the Company for approximately forty days, until June 25, 2021, after he escalated the issue to the Vice President of Human Resources, Lisa Eilers, who is located in the Company's Tampa, Florida office.

55.     Despite Plaintiff's many efforts at imploring Ms. Kristan and Ms. Yaggie for help, he and his wife were not officially enrolled in the Company's health insurance plan until July 1, 2021.

56.     Shortly before being finally enrolled in the Company's health insurance plan, in or about early June 2021, Plaintiff was summoned to a meeting with Ms. Yaggie and Mr. Cooper.

57.     During this meeting, Mr. Cooper stated that, although Plaintiff "added value to the Company," he was being transitioned to an "alternate project management position *that better suited his strengths*." Ms. Yaggie added that she believed Plaintiff's "*head wasn't in the game*," a clear reference to his having to care for his disabled wife.

58.     Plaintiff was then informed that he was being replaced by an employee named Theodore Smith who was several years his junior and would become the new Maintenance Manager.

59.     Even in his lesser new role as a Project Manager, Plaintiff continued to successfully manage multiple projects that increased workplace efficiency and improved employee safety measures.  Nevertheless, Plaintiff was shunned and excluded from staff meetings.  Moreover, the Company inexplicably segregated Plaintiff from his colleagues in the production and maintenance

departments by physically moving his works space to a windowless room that was being used as a storage/overflow closet.

## V.   Plaintiff is Terminated Just Weeks After Taking Intermittent FMLA Leave to Care for His Wife After She Had Just Been Admitted to the Emergency Room

60.     In late July 2021, Plaintiff requested additional intermittent FMLA leave to care for his wife who was exhibiting worsening and debilitating symptoms from her declining mental health, including pacing nonstop during daytime hours, interrupted and difficulty falling asleep, sparse appetite (including an over 40-pound weight loss since the prior year), and other severe medical issues.

61.     Plaintiff was approved for this leave, including an absence on August 11, 2021, when his wife was admitted to an emergency room.

62.     Just two weeks later, on August 26, 2021, Plaintiff was called into a meeting with Ms. Yaggie.  Plaintiff believed he was being summoned to help Mr. Smith who was falling behind on his projects as the new Maintenance Manager.  Instead, Plaintiff was told that, due to "current volume changes," he was being terminated, effective September 3, 2021.

63.     In response to Plaintiff's bewilderment at this news, Ms. Yaggie demanded his keys and badge and presented him with a separation letter.  Plaintiff complied and handed her his key and badge before asking if he could go to his computer to remove his personal files, including documents that were related to his wife's medical treatment and their medical benefits.

64.     Upon getting back to his desk. Plaintiff learned that he had already been locked out of his computer and, therefore, could not retrieve his personal files, including those related to his wife's health.  Plaintiff then called Ms. Yaggie to let her know that he was unable to retrieve the necessary files from his computer.  Three weeks later, these very important documents were finally sent back to Plaintiff.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Discrimination in Violation of the ADA**
*Against Defendant Refresco*

65.     Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

66.     The ADA prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4).

67.     To state a claim for associational discrimination under the ADA, a plaintiff must allege: 1) that he was qualified for the job at the time of an adverse employment action; 2) that he was subjected to adverse employment action; 3) that he was known at the time to have a relative or associate with a disability; and 4) that the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision. Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 432 (2d Cir. 2016).

68.     Plaintiff has pled that he was able to perform the essential functions of the Maintenance Manager; after all, Refresco continued his employment for several years after the Cott Beverages acquisition in 2018, and provided him with positive performance reviews and yearly bonuses, until he put them on notice of his wife's disabilities.

69.     As described above, Defendant Refresco has discriminated against Plaintiff in violation of the ADA by denying him equal terms and conditions of employment because of his wife's disabilities, including, but not limited to, subjecting him to an unlawful PIP immediately after taking leave to care for and accompany his wife to various doctor appointments related to her breast cancer and resulting depression, demoting and ostracizing him because "his head wasn't in

the game" (i.e. he was distracted) due to his need to care for his wife, and ultimately terminating his employment from the Company shortly after his request to include himself and his wife on the company's healthcare plan.

70.     As a direct and proximate result of Refresco's unlawful conduct in violation of the ADA, Plaintiff has suffered, and will continue to suffer, monetary and/or other economic harm for which he is entitled to an award of monetary damages.

71.     As a direct and proximate result of Refresco's unlawful conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, mental anguish, and emotional distress, for which she is entitled to an award of damages, to the greatest extent permitted under law.

72.     Defendant Refresco's unlawful discriminatory actions constitute malicious, willful, and wanton violations of the ADA for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
### Interference in Violation of the FMLA
#### Against All Defendants

73.     Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

74.     Section 2615(a)(1) of the Family Medical Leave Act, states in pertinent part: "Interference with rights. Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

75.     To state a prima facie claim for interference under the FMLA, a plaintiff must allege the following: "(1) that he is an eligible employee under the FMLA; (2) that the defendant is an employer as defined by the FMLA; (3) that he was entitled to take leave under the FMLA; (4) that he gave notice to the defendant of her intention to take leave; and (5) that he was denied to which

he was entitled under the FMLA." *Graziadio v. Culinary Instit. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016).

76.     Upon information and belief, Plaintiff and Defendant Refresco are subject to the FMLA, respectively, as an eligible employee and covered employer.

77.     By the actions described above, among others, Defendants have interfered with Plaintiff's rights under the FMLA by terminating his employment on August 26, 2021, effectively depriving him of his right to take intermittent leave to care for his disabled wife.

78.     As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Plaintiff has suffered, and will continue to suffer, monetary and/or other economic harm for which he is entitled to an award of monetary damages, liquidated damages, and other relief.

79.     As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## AS AND FOR A THIRD CAUSE OF ACTION
### Retaliation in Violation of the FMLA
#### *Against All Defendants*

80.     Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

81.     To establish a prima facie case of FMLA retaliation, a plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for her position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under

circumstances giving rise to an inference of retaliatory intent.  *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016) (quotation omitted).

82.     Plaintiff exercised rights protected under the FMLA by requesting leave on or about June 28, 2021, and a second time on February 4, 2022.

83.     Plaintiff consistently received positive performance reviews over the course of his employment, until he returned from his first FMLA intermittent leave and shortly thereafter received a performance review with baseless, negative comments and was subsequently placed on an unfounded Performance Improvement Plan (PIP).

84.     In response to Plaintiff's activities, which were protected conduct under the FMLA, Defendants wrongfully retaliated against Plaintiff by placing him on an unfounded Performance Improvement Plan (PIP), shortly after he availed himself of his first FMLA leave, by failing to engage in any substantive discussions to improve such allegedly deficient performance, unilaterally stripping him of his duties by demoting him to a Project Manager, and ultimately, by terminating Plaintiff all within close proximity to additional FMLA intermittent leave requests.

85.     As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Plaintiff has suffered, and will continue to suffer, monetary and/or other economic harm for which he is entitled to an award of monetary damages, liquidated damages, and other relief.

86.     As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Discrimination in Violation of ADEA
### *Against Defendant Refresco*

87.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

88.     Based on the facts alleged herein, Defendant Refresco has engaged in unlawful employment practices prohibited by the ADEA by discriminating against Plaintiff based on his age (65) by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or remedy a hostile work environment and disparate treatment.

89.     As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission, and other compensation that her employment entailed, severe emotional, psychological and physical stress, distress, anxiety, pain and suffering, the inability to enjoy life's pleasures, and other non-pecuniary losses and special damages.

90.     Accordingly, as a result of the unlawful conduct of Refresco, Plaintiff has been damaged and is entitled to the maximum compensation available to him under this law, including, but not limited to, liquidated damages.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Discrimination in Violation of the New York State Human Rights Law
### *Against All Defendants*

91.     Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

92.     As described above, Defendants have discriminated against Plaintiff on the basis of his age and/or associational disability in violation of the New York State Human Rights Lawby

18

fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or remedy a hostile work environment and disparate treatment based on his age and/or associational disability.

93.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered, and will continue to suffer, economic damages, mental anguish, and emotional distress for which he is entitled to an award of damages.

94.     Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of the New York State Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**Aiding and Abetting Violations of the New York State Human Rights Law**
***Against Defendant Cooper and Defendant Yaggie***

95.     Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

96.     By the action described above, Defendants Cooper and Yaggie knowingly or recklessly aided and abetted the discrimination that has been committed against Plaintiff in violation of the New York State Human Rights Law.

97.     As a direct and proximate result of the unlawful conduct aided and abetted by Defendants Cooper and Yaggie in violation of the New York State Human Rights Law, Plaintiff has suffered, and will continue to suffer, economic damages, mental anguish, and emotional distress for which she is entitled to an award of damages.

98.     The unlawful discriminatory and retaliatory actions aided and abetted by Defendants Cooper and Yaggie constitute malicious, willful, and wanton violations of the New York State Human Rights Law, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendant:

A.      Declaring that the actions, conduct and practices complained of herein violate the laws of the United States and State of New York;

B.      Awarding damages to the Plaintiff for all lost wages and benefits resulting from Defendants' discrimination in employment and to otherwise make him whole for any losses suffered as a result of such unlawful employment practices;

C.      Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain, and suffering in an amount to be determined at trial;

D.      Awarding Plaintiff liquidated damages;

E.      Awarding Plaintiff punitive damages;

F.      Awarding Plaintiff pre-judgment and post-judgment interest as applicable;

G.      Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

H.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' unlawful employment practices.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  August 25, 2023
　　　　White Plains, New York　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　**FILIPPATOS PLLC**


By: _____
　　　　Parisis G. Filippatos
199 Main Street, Suite 800
White Plains, NY 10601
T./F.: 914-984-1111
Pgf@filippatoslaw.com

***Counsel for Plaintiff***

21